# **<u>EXHIBIT A</u>**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION
## MORTGAGE FORECLOSURE/MECHANICS LIEN SECTION

WELLS FARGO BANK, NATIONAL
ASSOCIATION, AS TRUSTEE, ON
BEHALF OF THE REGISTERED
HOLDERS OF CSAIL 2019-C16
COMMERCIAL MORTGAGE TRUST,
COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES
2019-C16,

     *Plaintiff,*

    *v.*

1600 WESTERN VENTURE L.L.C., a
Illinois limited liability company;
U.S. SMALL BUSINESS
ADMINISTRATION; UNKNOWN
OWNERS; and NON-RECORD
CLAIMANTS,

    *Defendants.*

---

1600 WESTERN VENTURE L.L.C., a
Illinois limited liability company,

    *Counter-Plaintiff/
    Defendant,*

    *v.*

WELLS FARGO BANK, NATIONAL
ASSOCIATION, AS TRUSTEE, ON
BEHALF OF THE REGISTERED
HOLDERS OF CSAIL 2019-C16
COMMERCIAL MORTGAGE TRUST,
COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES

Case Number: 2024 CH 00050

Calendar 60

Honorable Debra A. Seaton,
Judge Presiding

Property Address:
2441, 2443, and 2444
West 16th Street,
Chicago, Illinois 60608

- 1 -

2019-C16,

        *Counter-Defendant/*
        *Plaintiff.*

WELLS FARGO BANK, NATIONAL
ASSOCIATION, AS TRUSTEE, ON
BEHALF OF THE REGISTERED
HOLDERS OF CSAIL 2019-C16
COMMERCIAL MORTGAGE TRUST,
COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES
2019-C16,

        *Counter-Counter-Plaintiff/*
        *Counter-Defendant/*
        *Plaintiff,*

    *v.*

1600 WESTERN VENTURE L.L.C., a
Illinois limited liability company,

        *Counter-Counter-Defendant/*
        *Counter-Plaintiff/*
        *Defendant.*[1]

## MEMORANDUM OPINION AND ORDER

**DEBRA A. SEATON, Circuit Judge:**

This matter comes before the Court on Plaintiff WELLS FARGO BANK,
NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE REGISTERED
HOLDERS OF CSAIL 2019-C16 COMMERCIAL MORTGAGE TRUST,
COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES
2019-C16's ("Wells Fargo") Amended Motion for Appointment of Receiver. For the

---

[1]    The Court has adjusted and reorganized the caption of the case to accurately reflect the
parties' positions relative to the causes of actions they have brought.

following reasons, Wells Fargo's Amended Motion for Appointment of Receiver is hereby GRANTED.

## I.   BACKGROUND

On or about April 8, 2019, Defendant 1600 WESTERN VENTURE L.L.C. ("1600 Western") allegedly entered into a loan with CIBC, Inc. ("CIBC") for $9 million. This loan is evidenced by a Promissory Note ("Note") which was secured by a Mortgage, Assignment of Leases and Rents and Security Agreement ("Mortgage") recorded against real property located at 2441, 2443 and 2444 West 16th Street in Chicago, Illinois ("the Property"). A separate Assignment of Leases and Rents ("ALR") was also recorded. In June of 2019, CIBC assigned its rights under the Mortgage to Wells Fargo. The Assignment was recorded in September 2019.

On January 3, 2024, Wells Fargo, in its capacity as the current holder of the Note and assignee of the Mortgage, filed a Verified Complaint ("Complaint") to foreclose upon the Mortgage. In its Complaint, Wells Fargo alleged that the loan was in default due to borrower's failure to pay the entire monthly amount due under the Note and Mortgage. This included the required amounts due for the Impound Account and for real estate taxes, beginning with the April 1, 2023 Payment Date and continuing for all subsequent payments. Additionally, Borrower, 1600 Western, failed to establish and maintain a Clearing Account for collection of all Rents upon the occurrence of a cash management triggering event within 30 days after Lender provided Borrower with written notice. (*See* Pl.'s Verified Compl., ¶5.)

On February 28, 2024, Wells Fargo filed an Amended Motion for
Appointment of Receiver ("Motion"), citing its contractual and statutory rights to
appoint a receiver under the Illinois Mortgage Foreclosure Law. Wells Fargo
requests in their Motion that the Court enter an order appointing a receiver for the
Property, permitting the collection of the rents, issues, and profits on the Property,
and holding the monies collected pending the foreclosure sale.

On April 19, 2024, 1600 Western filed a Response in Objection to Plaintiff's
Amended Motion for Appointment of Receiver. 1600 Western asserted in its
Response that (i) the Mortgage and ALR were not validly executed[2], (ii) there was
no consideration on the loan as per its Complaint, and (iii) that 1600 Western had
been making monthly payments to the Lender, raising a question of whether an
actual default exists. The Affidavit of Dorothy Flisk ("Affidavit"), was filed in
support of the Response. Ms. Flisk is the President of 1600 Western Manager, Inc.,
the Managing Member of Defendant 1600 Western Venture L.L.C. The Affidavit
stated that Ms. Flisk had never seen, signed, or agreed to the Mortgage and ALR
attached to Wells Fargo's Complaint, until after the filing of the lawsuit. On May 7,
2024, Wells Fargo filed a Reply to 1600 Western's Response in Objection to the
Amended Motion for Appointment of Receiver.

On March 18, 2024, 1600 Western filed its Verified Answer. Subsequently, on
April 26, 2024, 1600 Western filed a motion for leave to amend its Verified Answer.
Following briefing in June and July of 2024, the Court held oral argument on

---

[2]   Defendant notes discrepancies between the date of the signature page and the mortgage,
suggesting it was fraudulently affixed without mutual assent to the terms of the Mortgage.

August 7, 2024. The Court granted leave to amend the Verified Answer on August 14, 2024, but ordered that all admissions in the original Verified Answer were deemed evidentiary admissions.

On August 21, 2024, 1600 Western filed its Amended Answer and Counter-Complaint. 1600 Western denied all allegations that the Mortgage and ALR were validly executed. 1600 Western claims that the signatures of Ms. Flisk appeared to have been affixed to the final versions of the loan documents. 1600 Western maintains it never agreed—or even so much as reviewed—the loan documents at issue. The dates and the format of the signature page differed from the date and format of the loan documents. The signature page was dated March 28, 2019, whereas the Mortgage was dated "as of April 4, 2019."[3]

1600 Western raises three affirmative defenses in its Amended Answer. The first affirmative defense is "No Agreement." This defense alleges that the lack of mutual assent barred 1600 Western from entering into a valid agreement. The second affirmative defense asserted is "Want of Consideration." 1600 Western claims that the Mortgage was not supported by valid consideration. The third affirmative defense raised is "Payment." 1600 Western alleges that it made monthly payments which were not being applied to the loan. 1600 Western believes this questions the very existence of a default upon which Wells Fargo relies upon to file its lawsuit.

---

[3]    The Mortgage contained a scrivener's error which stated that the Mortgage was "as of April 4, 2019." A Scrivener's Affidavit was recorded on June 26, 2019 to correct the error to state that the Mortgage was "as of April 8, 2019."

1600 Western filed a Counterclaim to Quiet Title, along with filing the Amended Answer on August 21, 2024. In its Counterclaim to Quiet Title, 1600 Western requests that the Court declare the Mortgage and ALR void and to remove both as clouds on title. 1600 Western contends that the Mortgage and ALR were not validly executed and were fraudulently recorded. 1600 Western supports this conclusion using the discrepancy between the dates of the signature pages and final loan documents. 1600 Western seeks that title to the property be quieted in its name and the Mortgage and ALR be declared unenforceable.

In response to 1600 Western's Counterclaim, Wells Fargo filed its Answer on September 18, 2024 denying the allegations and asserting its own affirmative defenses: waiver and estoppel. Wells Fargo also brought its own counterclaims against 1600 Western. Wells Fargo raises counterclaims for a declaratory judgment, an equitable lien, equitable subrogation, unjust enrichment, and promissory estoppel. On September 30, 2024, 1600 Western moved to strike Wells Fargo's affirmative defenses and counterclaims as legally insufficient. Wells Fargo's counterclaims remain pending before the Court along with 1600 Western's Motion to Strike.[4]

On September 30, 2024, and November 18, 2024, the Court held an initial evidentiary hearing on the receiver motion.[5] The Court set further evidentiary

---

[4]     1600 Western never noticed this Motion to Strike for a hearing nor was the Motion to Strike ever ruled upon. As this Motion to Strike was filed more than nine months ago, it is DENIED by reason of the delay. *See* Cook Co. Cir. Co. R. 2.3.

[5]     Following the November 18, 2024, hearing, 1600 Western filed a Motion for a Substitution of Judge William B. Sullivan for Cause. The substitution motion was transferred for hearing before Judge James Derico. Effective February 3, 2025, Judge William B. Sullivan was transferred to Calendar 15 in the General Chancery Section. Judge Debra A. Seaton was transferred to Calendar 60 on February 3, 2025. Judge Derico ruled that the substitution motion was, therefore, moot as a

hearing dates for the receiver motion for June 2, 3, and 11, 2025 on April 25, 2025. By agreement of the parties, the Court was allowed to continue the evidentiary hearing starting with 1600 Western's witness. The Court was provided with and read a copy of the transcript up to and including Judge Sullivan's ruling on 1600 Western's oral motion for a directed finding. The Court did not read *any* testimony from 1600 Western's case, nor did the Court read anything that led to a Motion for Substitution of Judge. On June 2, 2025, the Court began the hearing anew with 1600 Western's witness, Dorothy Flisk.

On the *night* of June 10, 2025, approximately fourteen hours prior to when the final witness was set to testify, 1600 Western filed for Chapter 11 bankruptcy protection. On June 11, 2025, when the case was called, the Court took no action so as to not violate the bankruptcy automatic stay. On June 16, 2025, the bankruptcy court lifted the automatic stay permitting the remainder of the hearing to move forward. This Court entered an Order on June 17, 2025 setting the Motion for evidentiary hearing on June 24, 2025. All testimony concluded on that date.

The Court entered an order taking the Motion under advisement for the issuance of a written ruling following completion of the evidentiary hearings. The Court's ruling follows.

## II.    WITNESS TESTIMONY

Wells Fargo called three witnesses: Eduardo Descalzo, Elyse Spencer, and Attorney Gary Plotnick during the hearing. 1600 Western called one witness:

---

different judge was now presiding over Calendar 60. This case was then returned to Calendar 60 for Judge Debra A. Seaton to handle the remainder of the proceedings.

Dorothy Flisk. A synopsis of each witness's relevant testimony follows. Their testimony establishes the evidentiary underpinnings the Court used for its factual findings and ruling on the Motion.

### A. Plaintiff Witness #1—Eduardo Descalzo

Wells Fargo called Eduardo Descalzo, an asset manager at LNR Partners ("LNR"). LNR is the special servicer for the trust that owns the loan. Mr. Descalzo's responsibilities as an asset manager included working with the borrower in order to bring the special service loan back to regular servicing and cure the default, if possible. Mr. Descalzo explained that LNR took over from Midland Loan Services, the original master servicer, in mid-2023 after the loan became 60 days delinquent. Midland continued to handle billing, escrow, and payment processing. LNR managed the loan after it was transferred to special servicing due to the delinquency.

According to Mr. Descalzo, 1600 Western made a full payment in January of 2023, but failed to pay the full amount due in every subsequent month. In February of 2023, 1600 Western made two separate payments of $43,851.00. Neither payment was sufficient to cover the amount due at the time. In March of 2023, 1600 Western made three different payments totaling $97,835.80. Again, the payments fell short of the $182,688.81 due. 1600 Western continued making partial payments in April, May, and June of 2023. Each payment failed to satisfy the full monthly payment obligation. Mr. Descalzo also testified that Wells Fargo made numerous protective advances to attempt to cover the unpaid property taxes. However, 1600 Western

failed to deposit enough funds in the real estate tax escrow account beginning in February of 2023.

Mr. Descalzo testified that 1600 Western also failed to establish the required Cash Management Account[6] as required by the loan documents. On May 25, 2023, Midland Bank sent a letter to 1600 Western stating that a cash management triggering event had occurred and a Cash Management Account had to be established. Mr. Descalzo testified that 1600 Western's failure to establish the Cash Management Account constituted a separate and independent basis for default under the terms of the agreement.

On cross-examination, 1600 Western questioned Mr. Descalzo's knowledge of the events that predated 2023. Mr. Descalzo acknowledged that he was not involved in the original 2019 closing process. Mr. Descalzo's role as the asset manager began when the loan was transferred to LNR for special servicing. Mr. Descalzo was questioned about the existence and handling of the reserve funds in escrow. Mr. Descalzo did not know whether 1600 Western consented to the Scrivener's Affidavits[7] recorded to reconcile the date discrepancies between the dates of the recorded documents and the actual date the transaction closed.

On redirect, Mr. Descalzo testified that Sections 4.28 and 4.29 of the Loan Agreement designated that the reserve funds were held for specific purposes such

---

[6]    The Court understands that Mr. Descalzo's referral to a Cash Management Account is in reference to the Clearing Account.

[7]    Evidence was presented via Ms. Spencer that recording a scrivener's affidavit is a common method of curing a scrivener's error on a recorded document.

as capital repairs and leasing expenses. He stated that these funds could not be disbursed by a lender to cure the borrower's default.

### B. Defendant Witness #1—Dorothy Flisk

Defendant called Dorothy Flisk, its principal agent, to testify regarding the execution and formation of the loan documents. Ms. Flisk stated that on March 28, 2019, she voluntarily signed a series of blank signature pages on behalf of 1600 Western. These were delivered to her via email. The Mortgage, ALR, or Loan Agreement pages were not attached to the signature pages at the time of her signing. Ms. Flisk said that she did not explicitly authorize any of the signature pages she executed on March 28, 2019, to be affixed to any final documents. Ms. Flisk asserted that she did not sign any documents after March 28, 2019, despite various dates appearing on the final documents.

Ms. Flisk testified that she signed the signature pages and sent them to 1600 Western's attorney, Gary Plotnick. Attorney Plotnick then delivered the documents to Elyse Spencer, the commercial loan transaction closer for the title company, Freedom Title. Ms. Flisk testified that she did not review or receive final copies of the Mortgage, ALR, or Loan Agreement until mid-May 2019.[8]

Ms. Flisk stated that she had no knowledge of the receiver clause in the Mortgage because she was not able to view the final documents before the signatures were affixed. Ms. Flisk testified that she had *never* signed any mortgage in any of her numerous business loan transactions that contained a clause

---

[8]     This statement is directly contrary to Ms. Flisk's own affidavit which states in paragraph 8 that she did not see these documents "until after the filing of this lawsuit." (D.'s Resp. in Obj. to Pl.'s Amend. Mot. for Appt. of Receiver, Ex. D, ¶ 8.)

permitting the appointment of a receiver. On cross-examination, Ms. Flisk acknowledged that in a prior mortgage related to an entirely different loan, she had signed a mortgage which contained a clause permitting the appointment of a receiver. The prior mortgage included similar terms as the one at issue in this case. It contained a receiver clause with remedies in the event of default. Ms. Flisk ultimately received $9 million from CIBC after the closing of the loan. After the closing, Ms. Flisk made payments on this loan for several years.

While Ms. Flisk testified that she did not see the final documents until mid-May, she stated that Attorney Plotnick kept her apprised of all dealings and communications that took place over the course of the transaction's closing. On cross-examination, when Ms. Flisk was asked whether Attorney Plotnick kept her apprised of all developments during this time, she replied "I'm sure he did."[9]

Ms. Flisk's prior statements and the documentary record contradict her earlier claims regarding her lack of knowledge of the receivership clause and of the existence of the Mortgage. Wells Fargo introduced evidence a prior mortgage Dorothy Flisk had signed with the receivership clause present. This mortgage shows that Ms. Flisk was involved in other transactions that included similar provisions.

Ms. Flisk's demeanor while testifying was of particular concern to the Court. The Court noted Ms. Flisk's peculiar demeanor and distressed body language. She was visibly nervous while on the witness stand. Her shaking leg, crossed arms,

---

[9]    Wells Fargo asserted that these facts, along with her acknowledged notice of the relevant correspondence during the document preparations, indicated that she was aware of the loan's material terms and had ratified the transaction through her actions.

completely flushed and reddened face, repeated and excessive drinking of water were noted throughout her testimony. These mannerisms, coupled with her uncertain, contradictory, answers, and inconsistencies stood out to the Court.

### C.  Plaintiff Witness #2—Elyse Spencer

Wells Fargo called Elyse Spencer ("Spencer"), a senior commercial escrow officer at Freedom Title with over 20 years of experience. Ms. Spencer served as the designated "closer" for the loan. Ms. Spencer testified that she has handled thousands of commercial closings in her career and was responsible for coordinating the execution and recordation of the loan documents as well as disbursement of the monies following the funding of the loan.

Ms. Spencer testified that it is common practice to obtain signature pages from the parties in advance and to hold them in escrow until all closing conditions are met and the respective parties give their approval. This was the practice in all of the transactions she has been involved in. Ms. Spencer received Ms. Flisk's signed signature pages on March 28, 2019. She affixed these signatures to the finalized documents before recording those documents. Ms. Spencer emphasized that no material changes were made to the documents between the time that Ms. Flisk submitted her signatures and the recording of the documents.

While the closing of the loan took place on April 8, 2019, the various documents referenced three different dates—March 28, April 4, and April 8, 2019. CIBC's attorney, Mr. Favata, filed two Scrivener's Affidavits on June 21, 2019—one for the Mortgage and one for the ALR—to address these discrepancies. Ms. Spencer

affirmed that there were multiple ways that the erroneous date could be rectified. Recording a Scrivener's Affidavit was a routine way of correcting clerical errors.

Ms. Spencer maintained communication with 1600 Western and its counsel regarding the final approvals and wire transfers. Wells Fargo introduced into evidence several different emails between the parties showing that Ms. Flisk participated in and acknowledged the funding process. Ms. Flisk even thanked CIBC for its assistance after the funds were released.

On cross-examination, Ms. Spencer testified that she never received any indication from Ms. Flisk or her counsel that there were disagreements or disputes regarding the terms in the final documents. All documents sent to the recorder's office were those that she finalized using the materials provided and authorized by both parties.

### D. Plaintiff Witness #3—Gary Plotnick

Wells Fargo called Attorney Gary Plotnick to testify regarding his role as 1600 Western's attorney in handling the commercial loan and mortgage transaction. Attorney Plotnick stated that he represented 1600 Western in 2019 during the preparation of the loan from CIBC. Attorney Plotnick had represented 1600 Western in a previous October of 2016 loan related to a separate business matter. He testified that he had represented both borrowers and lenders roughly 200-300 times prior to April of 2019 in commercial loan transactions.

Attorney Plotnick testified that he had the authority to represent 1600 Western throughout the entirety of the transaction. This included negotiation and

preparation of all documents related to the loan. Mr. Favata, Attorney Plotnick, and Ms. Spencer communicated with each other numerous times throughout the entirety of the transaction. As counsel for 1600 Western, Attorney Plotnick had multiple responsibilities in ensuring the efficient preparation of all documents. He sent all of the recordable documents and signature pages to the title company, drafted the legal opinion letter that CIBC requested in order to approve the loan disbursement, and confirmed all finalized documents. Most importantly, Attorney Plotnick communicated with Ms. Flisk multiple times through email and over the phone between April 2 and April 8, 2019. Ms. Flisk was included in all relevant correspondence and communications according to Attorney Plotnick.

Attorney Plotnick testified that he had the authority to close the loan on behalf of his client, 1600 Western. In an email dated April 8, 2019 Ms. Spencer asked Attorney Plotnick to authorize the funding of the loan. Attorney Plotnick explained that this meant the title company had all of the necessary documents and monies from the bank. They were simply waiting on authorization from both 1600 Western and CIBC. Attorney Plotnick in responding to that email bestowed authorization on behalf of his client 1600 Western. The loan was funded and Freedom Title recorded the documents with the Cook County Recorder of Deeds.

Defense counsel never rebutted the purported authority of Attorney Plotnick to act on behalf of 1600 Western. Attorney Plotnick conceded that the legal opinion letter he issued erroneously stated that the loan was for $9.5 million instead of the

correct amount for $9 million.[10] This Court finds that this error does not detract from the authority that Attorney Plotnick had to act on behalf of his client for the entirety of the transaction nor his credibility. Attorney Plotnick acknowledged the change in the loan amount. He also acknowledged his authority to proceed with the change in the loan.

### III.   LEGAL STANDARD

Wells Fargo moves this Court for the appointment of a receiver. "Whenever a receiver is sought to be appointed in any action in which a foreclosure is also pending, a receiver shall be appointed only in accordance with this Article." 735 ILCS 5/15–1701(f). Section 15-1701(b) states:

> [P]rior to the entry of a judgment of foreclosure: (***) if (i) the mortgagee is so authorized by the terms of the mortgage or other written instrument, and (ii) the court is satisfied that there is a reasonable probability that the mortgagee will prevail on a final hearing of the cause, the mortgagee shall upon request be placed in possession of the real estate, except that if the mortgagor shall object and show good cause, the court shall allow the mortgagor to remain in possession. 735 ILCS 5/15-1701(b)(2).

Section 15-1702(a) provides that "[w]henever a mortgagee entitled to possession so requests, the court *shall* appoint a receiver." 735 ILCS 5/15–1702(a) (emphasis added). Section 15-1105(b) defines "shall" as "mandatory and not permissive." *See Bank of America, N.A. v. 108 N. State Retail LLC*, 401 Ill. App. 3d 158, 164 (1st Dist. 2010).

---

[10]     The typographical error in the opinion letter clearly should have stated $9 million not $9.5 million. Elsewhere in the opinion letter itself, it states that the loan was for $9 million. Also, it is clear from the testimony and evidence presented that the loan was originally supposed to be for $9.5 million, but was later reduced to $9 million. This typographical error most likely derived as an artifact of this change in the loan amount prior to closing.

"[T]he Foreclosure Law creates a presumption in favor of the mortgagee's right to possession of nonresidential property during the pendency of a mortgage foreclosure proceeding." *Id.* Mortgagors of non-residential real estate are required to overcome the statutory presumption in favor of the mortgagees if they wish to retain possession of the premises. *Travelers Insurance Co. v. LaSalle National Bank*, 200 Ill. App. 3d 139, 143 (2nd Dist. 1990). If the mortgagor objects to the appointment of a receiver, the burden then shifts to the mortgagor to demonstrate "good cause" to remain in possession. 735 ILCS 5/15-1701(b)(2); *108 N. State Retail LLC*, 401 Ill. App. 3d at 164. Efforts to develop, refinance, or sell the property are not sufficient to overcome the statutory presumption in favor of placing the mortgagee in possession. *Centerpoint Properties Trust v. Olde Prairie Block Owner, LLC*, 398 Ill. App. 3d 388, 396 (1st Dist. 2010).

## IV.   ANALYSIS

The question before the Court is whether Wells Fargo is entitled to the appointment of a receiver. Notably, Wells Fargo filed its Motion over sixteen months ago. Completion of this evidentiary hearing on this Motion has spanned over the course of 267 days, from September 30, 2024, through June 24, 2025. This Court acknowledges that it has a "fundamental obligation to resolve disputes fully, fairly, and *promptly*." *In Re: Time Standards for Case Closure in Illinois Trial Courts, M.R. 31228* (emphasis added). The delay in completing this hearing is documented in footnotes and not explained here.

## A. Applicable Law

Illinois Mortgage Foreclosure Law states that a mortgagee is entitled to possession of non-residential property prior to judgment if: (1) the mortgage or another written instrument authorizes possession or the appointment of a receiver upon default, and (2) there is a reasonable probability that the mortgagee will prevail on the merits at a final hearing. 735 ILCS 5/15-1701(b)(2). If both conditions are satisfied, the court shall appoint a receiver upon request. 735 ILCS 5/15-1702(a).

To establish a reasonable probability that the mortgagee will prevail on the merits at a final hearing, a Plaintiff must first demonstrate that a prima facie case for foreclosure exists. This requires proof that: (1) the plaintiff is the holder of the note and mortgage; (2) the note and mortgage were properly executed; and (3) a default has occurred. *Rago v. Cosmopolitan National Bank*, 89 Ill. App. 2d 12, 19 (1st Dist. 1967). A proven default alone is sufficient to satisfy the "reasonable probability of success" standard for purposes of the appointment of a receiver. *Centerpoint Properties Trust*, 398 Ill. App. 3d at 392. Once a prima facie case is established, the burden shifts to the mortgagor to prove any applicable affirmative defense. *PNC Bank, N.A. v. Zubel*, 2014 IL App (1st) 130976, ¶ 18.

## B. Discussion

This Court will analyze each element and decide if 1600 Western's affirmative defenses and counterclaim have any reasonable probability of success that would nullify Wells Fargo's probability of prevailing on the merits.

1. *The Mortgage Authorizes Appointment of a Receiver upon Default*

The Court finds that the Mortgage contains an express provision authorizing the appointment of a receiver upon default. Illinois Mortgage Foreclosure Law states that a receiver must be appointed if the mortgagee demonstrates that the mortgage or another written instrument "authorizes the appointment of a receiver" upon default. 735 ILCS 5/15-1701(b)(2). This prong is satisfied when the mortgage itself contains language granting the lender the right to seek a receiver in the event of default. Wells Fargo has met this requirement.

Wells Fargo submitted evidence of the operative Mortgage and the accompanying ALR recorded in April 2019. Ms. Spencer credibly testified that she personally coordinated the closing and attached the Defendant's signature page, executed on March 28, 2019, to the finalized mortgage documents that were later recorded. In the September 30, 2024 evidentiary hearing, the Court took judicial notice that Article 3.1(d) of the subject mortgage has a provision for the appointment of a receiver. Article 3.1(d) of the Mortgage states,

> Upon, or at any time prior to or after, initiating the exercise of any power of sale, instituting any judicial foreclosure or instituting any other foreclosure of the liens and security interests provided for herein or any other legal proceedings hereunder, make application to a court of competent jurisdiction for appointment of a receiver for all or any part of the Property, as a matter of strict right and without notice to Borrower and without regard to the adequacy of the Property for the repayment of the Secured Obligations or the solvency of Borrower or any person or persons liable for the payment of the Secured Obligations, and Borrower deos hereby irrevocably consent to such appoitnment, waives any and all notices of and defenses to such appointment and agrees not to oppose any application therefor by Lender, but nothing herein is to be construed to deprive Lender of any other right, remedy or privilege Lender may now have under the law to

have a receiver appointed; _provided_, _however_, that, the appointment of
such receiver, trustee or other appointee by virtue of any court order,
statute or regulation shall not impair or in any manner prejudice the
rights of Lender to receive payment of the Rents and Profits pursuant
to other terms and provisions hereof. Any such receiver shall have all
of the usual powers and duties of receivers in similar cases, including,
without limitation, the full power to hold, develop, rent, lease, manage,
maintain, operate and otherwise use or permit the use of the Property
upon such terms and conditions as said receiver may deem to be
prudent and reasonable under the circumstances as more fully set
forth in **Section 3.3 hereof**. Such receivership shall, at the option of
Lender, continue until full payment of all of the Secured Obligations or
until title to the Property shall have passed by foreclosure sale under
this Mortgage or deed in lieu of foreclosure. (emphasis in original)

The recorded Mortgage clearly authorizes the appointment of a receiver in

the event of default. Wells Fargo's unrebutted evidence establishes the existence

and enforceability of that clause.

### 2. _There is a Reasonable Probability that the Mortgagee Will Prevail on the Merits at a Final Hearing_

This Court finds that there is a reasonable probability that Wells Fargo will

prevail on the merits at a final hearing. Wells Fargo has established at least two

events of defaults under the terms of the Mortgage.

Article II of the Mortgage details what constitutes an event of default. Article

2.1 states:

[T]he occurrence of an Event of Default under the Loan Agreement or a
default hereunder or under any other Loan Document that shall not
have been cured within the applicable notice and/or grace period
provided therefor (if any) shall be deemed an event of default under
this Mortgage.

Article V of the Loan Agreement lists out the various scenarios in which the

Borrower would be in default of the Agreement. Section 5.1(a) states:

[B]orrower fails to punctually perform any covenant, agreement, obligation, term of condition of the Note, this Agreement, the Mortgage or any other Loan Document which requires payment of any money to Lender (including, without limitation, the failure of Borrower to repay the entire outstanding principal balance of the Note in full on the Maturity Date), this occurrence would constitute on event of default.

The Assignment of Leases of Rents sets out the circumstances in which an

Event of Default occurs. Section 12 states:

[I]t shall be an 'Event of Default' hereunder if Borrower shall be in breach of any covenant or agreement contained herein or if any Event of Default shall occur under the Loan Agreement. Upon the occurrence of an Event of Default hereunder, Lender may exercise any and all of the rights and remedies provided for herein, at any time, and from time to time, in Lender's sole and absolute discretion.

Similarly, 4.28 and 4.29 of the Loan Agreement states the conditions that

would lead to a default:

Borrower shall pay to Lender the sum of $2,415.28 to be held in a reserve fund (the "Replacement Reserve") subject to this Agreement, for payment of certain repairs and replacements at the Property which, under generally accepted accounting principles, are categorized as capital expenses and not as operating expenses ("the Repairs") (***) (g) Lender shall have the right, but not the obligation, at any time during the continuance of an Event of Default, in its sole and absolute discretion, to apply any and all funds on deposit in the Cash Collateral Reserve to the Debt, in such order and in such manner as Lender shall elect in its sole and absolute discretion, including to make a prepayment of Debt (***) or any other amounts due hereunder."

Failure to establish a Clearing Account also constitutes a default. Article

3.1(a) of the Loan Agreement states,

[A]t the election of Lender, exercised from time to time (i) after the occurrence and during the existence of an Event of Default, (ii) at any time Lender reasonably believes that Clearing Bank is not adequately performing its duties under the Clearing Bank Agreement, (iii) at any time after the credit rating of the Clearing Bank falls below the requirements of an Eligible Bank (unless Lender has waived the

Eligible Bank requirements) or (iv) at any time after Lender has waived the Eligible Bank requirements for the Clearing Bank, but Lender has elected, in its sole and absolute discretion, to require that the Clearing Account be located at an Eligible Bank, Borrower will establish a new Clearing Account at an Eligible Bank (and such Eligible Bank shall enter into a new Clearing Bank Agreement in form and substance satisfactory to Lender).

Wells Fargo argues that the Note and Mortgage are in default for two reasons. (1) 1600 Western failed to pay the entire monthly amount due under the Note and Mortgage beginning in February of 2023. This includes the required amounts due for the Impound Account ("tax escrow") for real estate taxes, beginning with the April 1, 2023 payment date and continuing for all subsequent payments. (2) 1600 Western failed to establish and maintain a Clearing Account for collection of all rents upon the occurrence of a Cash Management triggering event within 30 days after Wells Fargo provided 1600 Western with written notice. Wells Fargo asserts that it has the right to foreclose upon the Mortgage and obtain an order directing the sale of the Property to satisfy the indebtedness it is owed because of these defaults.

1600 Western denies these assertions. It argues that it made monthly payments that were not applied to the loan. 1600 Western maintains that there was a balance in the reserves account in the amount of $182,000.00. It is these reserve funds that 1600 Western argues should have been applied to the late payment defaults.

Wells Fargo showed that, in addition to payment delinquencies, the borrower failed to establish a Clearing Account as required by the Loan Agreement once a

monetary default occurred. Notices regarding this failure were sent in May of 2023. No corrective action was taken by 1600 Western. These failures constituted an independent basis for default under the loan documents.

1600 Western failed to present any credible evidence rebutting these defaults. While 1600 Western pointed to reserve tax escrow balances of approximately $182,000, Mr. Descalzo credibly testified that the reserves were restricted for specific uses such as capital repairs and leasing expenses. These reserves could not be used to cure payment defaults. This testimony was consistent with the loan documents. (Pl.'s Ex. 70, §§ 4.28-29.)

Mr. Descalzo's sworn testimony, along with the transaction logs provided by Wells Fargo detailing the missed payments from 1600 Western constitute sufficient proof to this Court of an Event of Default. Because a default has been proven, Wells Fargo has established a prima facie case for a foreclosure. The burden now shifts to 1600 Western to see whether its affirmative defenses or counterclaim negate this prima facie finding.

### 3. 1600 Western's Defenses and Counterclaim

1600 Western raises three affirmative defenses and a counterclaim. The Court must consider whether 1600 Western's asserted affirmative defenses or counterclaim preclude a finding that Wells Fargo is likely to prevail on the merits at trial. These affirmative defenses include (1) No Agreement, (2) Want of Consideration, and (3) Payment. The first two affirmative defenses raise challenges to the enforceability of the Mortgage. Is there an existence of a default where there

is not an enforceable Mortgage? The defense of payment challenges the validity of the default. The Counterclaim to Quiet Title requests this Court to declare that 1600 Western is the rightful owner of the Property. 1600 Western asserts that the Mortgage is not enforceable. 1600 Western asks this Court to remove any outside claims or title encumbrances and quiet title into 1600 Western. The Court's analysis under Section 15-1701(b)(2) to each affirmative defense and the counterclaim to quiet title follows.

### a.  First Affirmative Defense

1600 Western's first affirmative defense of "No Agreement" posits that the Mortgage was not validly executed by Ms. Flisk. Ms. Flisk signed only standalone sheets of blank signature pages on March 28, 2019. 1600 Western contends that Ms. Flisk's signatures were fraudulently affixed to the loan documents without her knowledge or consent—constituting a forgery. 1600 Western bolsters its claim by asserting that Ms. Flisk never reviewed the Mortgage or ALR on the date of closing, April 8, 2019. 1600 Western argues that there was no meeting of the minds; no agreement between the contracting parties.

The Court is not persuaded by this argument. The overwhelming evidence shows that Ms. Flisk knowingly participated in the loan transaction and ratified the terms of the Mortgage through her actions.

Standard practice ("99% of the time") according to Ms. Spencer is to obtain signature pages in advance and to hold them in escrow until all the closing conditions were met. This was not rebutted. No material changes were made to the

loan documents between the time of receiving Ms. Flisk's signature pages and the time of recording. Ms. Spencer confirmed that no alternate version of the Mortgage was received from 1600 Western or her counsel. Nor were any objections raised before or immediately after closing. The Scrivener's Affidavit correcting the dates on the Mortgage was merely done as a precaution—meant solely to clarify a minor clerical inconsistency in the dates of the loan agreements. The Scrivener's Affidavit did not alter any substantive terms of the agreement. The validity of the loan documents had already been approved, executed, and funded without objection. The Affidavits reflect the title company's meticulous approach to ensuring transparency and accuracy in the record, rather than casting doubt on the transaction.

Ms. Flisk's testimony is contradicted by her own actions and prior statements. She signed the Note and loan disbursement instructions on April 8, 2019. Both expressly acknowledge the Mortgage. She accepted $9 million in loan proceeds on behalf of 1600 Western that same day. Ms. Flisk then emailed CIBC thanking it after the funds were released. She signed the settlement statement disclosing key financial terms. Ms. Flisk's own conduct confirms her assent.

The emails admitted corroborate her knowledge and active participation in funding-related communications on and through April 8, 2019. Ms. Flisk also admitted that she had likely remained informed about the process through her counsel, Attorney Plotnick. While she could not specifically remember the information contained in the email correspondences, her inclusion in the various email chains demonstrates that she was consistently apprised of developments in

the transaction. Attorney Plotnick was authorized to review, prepare, and close the loan on behalf of 1600 Western. He confirmed that he granted final approval for funding on April 8, 2019 after confirming all documents were in order. As 1600 Western's legal representative, his authority to act and approve closing documents binds 1600 Western. *See Sakun v. Taffer*, 268 Ill. App. 3d 343, 351 (1st Dist. 1994) (holding that a client is bound by the acts or omissions of their attorney when acting within the scope of the attorney's authority, and that apparent authority may be established where the principal knowingly allows the attorney to act and thereby induces reasonable reliance); and *Condon & Cook, L.L.C. v. Mavrakis*, 2016 IL App (1st) 151923, ¶63 ("[w]here a party stands by silently and lets his attorney act in his behalf in dealing with another in a situation where the attorney may be presumed to have authority, the party is estopped from denying the agent's apparent authority to a third person.").

There is ample evidence that Ms. Flisk had knowledge of the Mortgage. Specifically, when Ms. Flisk testified that she had never signed a mortgage with a receivership clause, Wells Fargo introduced evidence of a prior mortgage executed by her with a virtually identical receivership provision. Ms. Flisk was impeached on this issue. She then conceded that she had knowledge of a receivership provision in a mortgage. Ms. Flisk was not surprised by the existence of a mortgage with the inclusion of a receivership provision in this transaction. She had seen one before.

Ms Flisk acknowledged several times that she executed the Note for the loan. She does not dispute its provisions. The Note specifically states in paragraph 2,

"This Note is secured by and entitled to the benefits of; among other things, the Mortgage and the other Loan Documents." Ms. Flisk knew that her signature pages would be affixed to various documents. This would include the Mortgage and ALR. Various draft versions of the loan documents were sent to her as they were negotiated by Attorney Plotnick and Mr. Favata. The signature pages that Ms. Flisk signed each state the name of the document it would be attached to. For example, the Mortgage states, "In witness whereof, Borrower has executed this Mortgage as of the day and year first above written." The evidence overwhelmingly shows that Ms. Flisk could *not* have been unaware of the existence of a Mortgage and ALR.

Ms. Flisk's claim that she only signed the Note and was unaware of the Mortgage is undermined by the closing itself. The closing took place with the involvement of a *title company*, not only a bank. It is not standard practice for borrowers to communicate with a title company solely to execute a promissory note. Title companies typically facilitate the execution, escrow, and recording of mortgage documents as part of a full loan closing. Ms. Flisk's contact with the title company, along with her signed settlement statement, participation in funding communications, and subsequent acceptance of loan proceeds on behalf of 1600 Western, makes it implausible that she believed she was not executing or agreeing to a mortgage.

Attorney Plotnick testified that, unlike the bodies of the various loan documents which were paginated, the signature pages—delivered to Freedom Title prior to the completion of the documents' negotiation—were intentionally not

paginated. At the time that the signature pages were provided to Ms. Flisk for execution, the exact number of pages of the final document was not known. To eliminate any ambiguity, Ms. Flisk's signature pages did not include page numbers.

The Court finds that Ms. Flisk's conduct, admissions, contradictory testimony, participation in closing communications, grant of authority to Attorney Plotnick, and receipt and use of the loan proceeds, constitutes ratification of the Mortgage terms. *Condon & Cook, L.L.C.*, 2016 IL App (1st) 151923, ¶65 ("Further, [w]hen an act is performed for the benefit of another by a person without authority, or by an authorized agent in excess of his authority, the person for whose benefit the act was done may ratify the act. [R]atification of an unauthorized act is tantamount to an original authorization, and confirms what was originally unauthorized. A client ratifies the actions of his attorney by not repudiating the acts once he has knowledge of them or by accepting the benefits of those acts. [R]atification need not be express; it may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an [allegedly] unauthorized transaction." (internal citations and quotations omitted)). Ms. Flisk's claim that her signature was improperly affixed to the final documents is not supported by any competent evidence. Ms. Flisk's body language and vague answers cast doubt on her testimony as a whole. It undermined her credibility as a witness.

Accordingly, this affirmative defense does not defeat Wells Fargo's prima facie showing that the Mortgage and ALR were executed and are enforceable.

b. Second Affirmative Defense

1600 Western's second affirmative defense is that the Mortgage is unenforceable for "Want of Consideration." 1600 Western claims that the loan documents were not signed as part of a valid agreement and that the signature dates and execution process were irregular.

This defense largely repackages the same theory underlying 1600 Western's "No Agreement" argument. Namely, Ms. Flisk's signature was improperly affixed to the Mortgage without her review or consent. This Court has already rejected this legal theory. Ms. Flisk signed signature pages to be affixed to all related documents. This includes the Note and loan disbursement instructions. 1600 Western received $9 million in loan proceeds. Ms. Flisk also participated in communications surrounding the closing. 1600 Western's counsel, Attorney Plotnick, confirmed that he was authorized to prepare and approve the transaction documents on 1600 Western's behalf. These facts establish the consideration required.

Accordingly, 1600 Western has failed to show that the Mortgage lacked consideration.[11] This affirmative defense does not defeat Wells Fargo's reasonable probability of prevailing.

---

[11]      The Court notes that "want of consideration" does not constitute a proper affirmative defense under Illinois law. Unlike "failure of consideration" which admits the existence of a contract but excuses performance, "want of consideration" attacks the sufficiency of the claim itself and does not raise new matters. *See Space v. E.F. Hutton Co.*, 188 Ill. App. 3d 57 (4th Dist. 1989); *Worner Agency, Inc. v. Doyle*, 121 Ill. App. 3d 219 (4th Dist. 1984).

c.  Third Affirmative Defense

1600 Western's third affirmative defense, "Payment," asserts that there was no valid default under the Mortgage or Loan Agreement. This defense is not supported by the record.

Wells Fargo presented substantial and credible evidence of repeated payment deficiencies by 1600 Western beginning in February 2023. Monthly statements showed that 1600 Western failed to meet full payment obligations for several consecutive months, even after receiving notice of default. By June 2023, the past-due amount exceeded $200,000.00.

In addition to monetary delinquencies, 1600 Western failed to establish a Clearing Account within 30 days of written notice, as required following an Event of Default. This procedural failure constitutes an independent basis for default under the Mortgage and ALR.

While 1600 Western points to the existence of reserve funds, Mr. Descalzo credibly testified—and the loan documents confirm—that those funds were restricted for specific uses such as capital repairs and leasing costs. These funds could not be used to cure payment deficiencies during an ongoing default. 1600 Western offered no evidence to the contrary. No documentation was provided showing that a request for disbursement was made.

Accordingly, the Court finds that 1600 Western's assertion that there was no valid default is contradicted by the evidence and testimony. This defense fails to defeat Wells Fargo's reasonable probability of prevailing.

### d. Counterclaim to Quiet Title

1600 Western brings a Counterclaim to Quiet Title alleging that the Mortgage and ALR were fraudulently recorded. It asserts that the standalone signature pages were never intended to be affixed to the final loan documents. The Court does not need to resolve this claim at this stage. However, it must consider whether the allegations, if proven, would undermine Wells Fargo's future likelihood of success on the merits of its claim for foreclosure. This Court finds that it does not.

This Court finds that this Counterclaim is based on the same facts rejected in addressing 1600 Western's affirmative defenses. Ms. Flisk signed the settlement statement. 1600 Western accepted $9 million in loan proceeds. Ms. Flisk participated in closing communications.

1600 Western's own Verified Answer admits to paragraph three of Wells Fargo's Verified Complaint.[12] (Def. Verified Answer, ¶3.) "The Loan is evidenced by a Promissory Note ("the Note"), dated April 8, 2019, and is secured by a Mortgage, Assignment of Leases and Rents and the Security Agreement (the "Mortgage")." (Pl.'s Verified Compl., ¶3.) This statement is deemed an evidentiary admission.[13] (*See* Mem. Op. and Ord. 9-10, Aug. 14, 2024.)

1600 Western offers no alternate version of the loan documents. There is no evidence that Ms. Flisk or 1600 Western's attorney objected to the documents being

---

[12]    While this Verified Answer was later amended, the Court deemed the judicial admission contained within the original Verified Answer to be evidentiary admission. (*See* Mem. Op. and Ord. 9-10, Aug. 14, 2024); *Los Amigos Supermarket v. Metropolitan Bank & Trust Co.*, 306 Ill. App. 3d 115, 125 (1st. Dist. 1999).

[13]    "Statements considered admissions can be determined to be judicial admissions or evidentiary admissions." *Elliot v. Industrial Commission of Illinois*, 303 Ill. App. 3d 185, 187 (1st Dist. 1999). Ordinary judicial admissions conclusively bind a party, whereas evidentiary admissions may be contradicted or explained. *Id.*

recorded. 1600 Western's objections to the use of the Scrivener's Affidavits to correct date discrepancies are unavailing. Their argument involving the lack of page numbers on the signature pages is not persuasive. Nor is it supported by any corroborating evidence.

The Court finds that 1600 Western's Counterclaim to Quiet Title lacks merit. It does not defeat Wells Fargo's showing of a reasonable likelihood of success on the merits at final hearing.

Wells Fargo has established a prima facie case for foreclosure by presenting credible and unrefuted evidence of default under the terms of the Note, Mortgage, Loan Agreement, and ALR. 1600 Western's affirmative defenses and counterclaim rest upon a theory of fraudulent execution. There is no evidence of fraud in the record. These are not supported by the evidence and are rejected by the Court. 1600 Western has failed to carry its burden to rebut the default or to undermine the enforceability of the Mortgage. Accordingly, Wells Fargo has met the requirements for the appointment of a receiver.

1600 Western has failed to show good cause to remain in possession of the Property. The record is void of any evidence showing good cause as to why 1600 Western should remain in possession of the Property.

## V.   CONCLUSION

Wells Fargo is entitled to the appointment of a receiver. The Mortgage authorizes the appointment of a receiver. The Court is satisfied that there is a reasonable probability that Wells Fargo will prevail on a final hearing of this cause.

1600 Western's affirmative defenses and counterclaim do not defeat this finding.

1600 Western has not shown good cause to remain in possession of the Property.

Wells Fargo's Amended Motion for Appointment of Receiver is hereby GRANTED.

**THEREFORE, FOR THE AFOREMENTIONED REASONS, THE COURT HEREBY ORDERS AS FOLLOWS:**

(1) Wells Fargo's Amended Motion for Appointment of Receiver is hereby GRANTED;

(2) This matter is SET for status on July 18, 2025 at 10:30 AM via Zoom at the below list Zoom Information for selection of the receiver, setting of a maximum repairs amount, setting of a bond amount, and scheduling of the first reporting period; and

(3) 1600 Western's Motion to Strike filed on September 30, 2024, is hereby DENIED by reason of delay pursuant to Cook Co. Cir. Co. R. 2.3, *sua sponte.*

**Zoom Information:**
Meeting ID: 810 2556 7672
Passcode: 021601
Call-In: (312) 626-6799

**IT IS SO ORDERED.**

Date: July 2, 2025

ENTERED:

Honorable Debra A. Seaton
Cook County Circuit Judge

ORDER PREPARED BY THE COURT
ccc.mfmlcalendar60@cookcountyil.gov
(312) 603-3894

Judge Debra Ann Seaton

JUL 02 2025

Circuit Court - 2199

- 32 -