**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 1600 Western Venture L.L.C., | ) | Bankr. No. 25-08821 |
| | ) | |
| Debtor. | ) | Chief Judge Jacqueline P. Cox |

**Amended Memorandum Opinion**

**I. Introduction**

In its Motion to Excuse Turnover Pursuant to Section 543(a) and (b) of the Bankruptcy

Code, Wells Fargo Bank, National Association, as Trustee, on behalf of the Registered Holders

of CSAIL 2019-C16 Commercial Mortgage Trust, Commercial Mortgage Pass-Through

Certificates, Series 2019-C16 ("Lender") and holder of a mortgage asks the court to excuse any

receiver appointed by a state court from turnover to 1600 Western Venture L.L.C.  (the "Debtor")

of the non-residential industrial complex located at 2441, 2443 and 2444 West 16th  Street,

Chicago, Illinois (the "Property").

The Lender posits several reasons to allow the receiver to take and remain in possession

of the property despite the bankruptcy case:

a. failure to pay the lender monies owed under the relevant documents;

b. failure to establish a clearing account for the collection of rents upon occurrence of

cash management triggering event;

c. failure to insure the property;

d.  failure to pay real estate taxes;

1

e. use of operating income to feed the equity owners;

f. use of cash collateral to pay non-business expenses;

g. failure to maintain a professional property manager as required by the loan documents;

h. failure to submit to lender requested financial documents, cvs, resumes and experience regarding the qualifications of the individuals whom the Debtor seeks to run the property because the cost of a professional management company is alleged to be too expensive and

i. failure to submit information regarding the insurance policy the Debtor is alleged to have procured post-petition.

The court finds that the movant has shown by a preponderance of the evidence that several of the grounds listed are supported by the evidence submitted at trial and are sufficient reasons to excuse the receiver appointed by state court from turning over the property to the Debtor.

## II. Background[1]

In 2019 CIBC Inc. loaned $9,000,000 to the Debtor. The loan is evidenced by a promissory note, a mortgage, assignment of leases and rents and a security agreement. CICB Inc. assigned its interest in the note and mortgage to Wells Fargo. The Debtor is alleged to have failed to pay the entire monthly amount due, including required amounts for an impound account for real estate taxes beginning in 2023. The Debtor is also alleged to have failed to establish and

---

[1] The trial of the motion proceeded for five days. There are five Transcripts (Tr.). The November 12, 2025 Transcript covers pages 1-261. Docket 219. The November 13, 2025 Transcript covers pages 262-503. Docket 221. The November 14, 2025 Transcript covers pages 504-652. Docket 222. The November 19, 2025 Transcript covers pages 653-905. Docket 223. The December 10, 2025 Transcript covers pages 906-1066. Docket 224.

maintain a clearing account for the collection of rents.  Emergency Motion to Use Cash

Collateral, Bankruptcy Case 25-08821, Docket 11, Exhibit, Foreclosure Complaint, p. 2.

This case was filed on June 10, 2025.  At one of the initial hearings of this matter the

bankruptcy court was told that this case was filed at the end of a five-day trial of a motion to

appoint a receiver.  On June 16, 2025, to avoid wasting judicial resources by having this court

hear or re-litigate matters pending in state court where five days of trial had already proceeded on

matters involving appointment of a receiver in which mortgage validity issues could have been

litigated, this court held that the state court could continue the hearing(s) on the matters before it.

Should the parties need to address the effect of the ensuing state court orders on the bankruptcy

case, they could do so in the future.  *See* Order, Docket 29.  That order has been appealed.  *See*

Case 25-cv-7369, now pending in the U.S. District Court for the Northern District of Illinois.

Soon after this court entered the June 16, 2025 order, the state court concluded its hearing

and entered a July 2, 2025 Memorandum Opinion; it appointed a receiver to manage the Debtor's

property.  This court entered an order on July 2, 2025 allowing any party to file an objection by

July 7, 2025 should it oppose this court reviewing the state court opinion.

On July 7, 2025, the Debtor filed an objection to this court reviewing the state court

opinion.  However, the objection was not set for hearing so that this court could rule on it.  The

objection centered on this court not limiting what the state court could consider, i.e., whether it

could rule only on whether to appoint a receiver or the validity of the lender's lien which was

challenged based on discrepancies in the documents the Debtor's principal signed when the debt

was incurred.  This court was trying to not have to re-litigate whatever issues the state court was

resolving so as not to potentially issue conflict judgments, to avoid judge shopping and to avoid

wasting judicial resources by having repetitive litigation proceed. The Debtor suggested in the objection that the "this court should only use the opinion for a determination of the one issue that brought about the completion of the state court proceeding (validity of the lien of Wells Fargo) and not allow the Receiver to control the Debtor's real estate in the post-petition takeover while this bankruptcy case is near its inception."). This court's June 16, 2025 order did not limit the state court and the Debtor has not been taken over in the post-petition period to date. In addition, this court has not relied on the state court's rulings; a contested hearing has been held herein.

The order states: "IT IS HEREBY ORDERED that the state court may continue the hearing(s) on the matters before it, unlimited at this time. Should the parties need to address the effect of the ensuing state court orders on this bankruptcy case, they can do so in the future." Order, Docket 29. It made no sense for this court to restrict what a state court could do to resolve matters before it. This was an effort to partially abstain from hearing a particular matter in the interest of comity with state courts and respect for state law. *See* 28 U.S.C. § 1334(c)(1). In any event, parties' rights are determined according to state law; this court then decides what effect the federal bankruptcy system has on those rights. What better way to determine parties' rights than by allowing a state court to determine what those rights are? After all, our Supreme Court has informed that "[c]ongress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. U.S.*, 440 U.S. 48, 54-55, 99 S.Ct. 914. 59 L.Ed.2d 136 (1979).

The Debtor states in the objection at Docket 65 that the bankruptcy court has exclusive jurisdiction to decide what is property of the bankruptcy estate. Objection, Docket 65, p. 6. The court may, in exercise of its discretion, allow a state court to complete its consideration of what a

4

debtor owns.  To rule otherwise encourages judge shopping by filing a bankruptcy case whenever a party does not like the likely outcome of a state court proceeding.

Also, in that objection the Debtor suggests that the Debtor has been removed from possession of its asset, the real property.  That is not true.  The Debtor remains in possession of its assets to date.

What followed is the lender's effort under section 543 of the Bankruptcy Code to excuse it from turning over the real estate to the Debtor now that the Debtor has filed for bankruptcy relief, which filing made the Debtor's property become property of the bankruptcy estate under Bankruptcy Code section 541.   The Debtor is in the position it would have been in had it not filed for bankruptcy relief right before the state court was concluding its efforts.  The Debtor has not suffered a loss due to the state court's ruling; it remains in possession of its assets.

### A. Eduardo Descalzo's Testimony

Mr. Descalzo of LNR Partners is an asset manager who manages loans that are in distress. Tr., p. 77.  He testified that the Debtor's financial statements showed that it had a profit of $702,441 in 2022.  Tr., p. 110.  The Debtor had a profit of $345,597 through September of 2023. Tr., p. 113.

The real estate taxes are passed through to the tenants.  Tr., p. 114.  In 2023, the tenants paid a total of $44,811.49 a month for real estate taxes which the Debtor collected from them. *Id.*  The lender's escrow analysis showed that the Debtor owed taxes in the amount of $456,934 in 2023.  Tr., p. 115.  The tenants paid more than was due.  *Id.*  However, the Debtor did not pay real estate taxes that year.  The lender's servicer paid those taxes.  Tr., p. 116.  The lender has been paying the Debtor's real estate taxes since 2022.  Tr., p. 125.

The Debtor was obligated to pay property insurance but did not do so. Tr., pp. 117-18. The insurance policy was allowed to lapse in December, 2024. Tr., p. 118. The lender's servicer has paid for force-placed insurance on the Debtor's property. Tr., p. 119.

The Debtor was required to cooperate with the lender's request for a cash management system by opening a clearing account; the rents were to be put into it to ensure payment of the loan and other obligations. Tr., p. 120. That obligation gets triggered by payment defaults. Tr., p. 121. The process was explained in a May 25, 2023 letter to the Debtor. Tr., p. 122. The Debtor did not comply. *Id.* Mr. Descalzo testified that instead of paying the expenses of the Debtor, its principals were disbursing funds to the equity partners. Tr., p. 123. In his opinion, a receiver would be better for the creditors. Tr., p. 127. The court agrees.

As of July 3, 2025, the Debtor owed Wells Fargo $12, 715,175.01. Tr., p. 571.

### B. Dorothy Flisk's Testimony

Dorothy Flisk is the owner and manager of the Debtor. She interacts with the tenants and serves as its bookkeeper. She holds an 85% stake in the Debtor. Transcript, p. 171. She acquired that from her father Brian Flisk and his twin brother who had owned it jointly. She also said that Brian's brother had owned it. Tr. p. 172. She purchased her interest around 2016. Brian Flisk was to be compensated in an undocumented buyout transaction. Tr., p. 172. They never discussed a price, but the funds were to come from the Debtor's operating account. Tr., p. 173. She did not have the records to show much Brian Flisk has been paid to date. Tr., p. 174. Brian is paid $75,000 a year as a management fee; he is not an employee. Tr., p. 174. Her brother Sean has a 15% stake in the Debtor. Tr. p. 174.

Their operating agreement which was required by their lender requires that the company

not make any loans to any affiliates or equity holder. Tr., p. 178. It also requires that funds be used only for its business. Tr., p. 179.

The Debtor has explained that it failed to pay its taxes because they increased from $140,000 to $370,000. However, they got the tax bill reduced. Tr., p. 179. The lender required a tax escrow.

Dorothy Flisk testified that the Debtor collected prorated tax payments from its triple net tenants and that the tenants' tax obligations were adjusted in September of each year. Tr., p. 185. Ms. Flisk admitted that at some point the Debtor had enough funds to pay the increase in insurance premiums. Tr., p. 187. The Debtor's property was uninsured for about four months. Tr., p. 187. Ms. Flisk thought it was sufficient to have liability insurance only. Tr., p. 188. However, she admitted that she knew coverage was not full in the 2024-2025 period. Tr., pp. 188-89. She admitted that the tenants were paying for building insurance through their triple net leases. Tr., p. 189. Dorothy said at a deposition that their sprinkler system was one of the reasons she felt okay with going without full insurance. Tr., p. 190.

Only Dorothy Flisk and Brian Flisk write checks on the Debtor's accounts. Tr., p. 209. From 2023 to 2025 the Debtor paid Brian Flisk for supplies and rental equipment. She testified that her father did not have to report to her with respect to monies he spends or checks that he wrote out of the Debtor's account pre-petition.. Tr., p. 217. . .

Dorothy Flisk was paid $129, 303.98 over the relevant two-year period for managing the property. Tr., pp. 219-20. Her salary was generally $85,000 a year. Tr., p. 220. A $2,825 check made out to her was for her condo mortgage; she signed it. Tr., pp. 220-21. There were 20 checks made out to her with nothing in the memo line. Tr., p. 221. She categorized them as

membership withdrawals in the system. Tr., p. 222. She testified that even though a $1,775 check was made out to Skyfall, her equestrian business, Skyfall had no business with the Debtor. Tr., p. 222. This was categorized as a withdrawal to her. Tr., pp. 222-23.

Dorothy's husband, John, received paychecks; there is no written employment agreement. Dorothy signed all of his checks. Tr., p. 233. A $2,200 check was written to Side Piece, Dorothy's bar located in Tennessee; it opened in October, 2025, while this bankruptcy case was pending. Tr., p. 228.

Checks totaling $55,231.16 were written to Elena Flisk, Brian's wife. Most of them were signed by Brian Flisk. Tr., p.229. Elena was employed by the Debtor. *Id.* One check's memo line indicated it was a loan but Dorothy Flisk said she did not categorize it as a loan in the system. Tr., p. 231. Her father may have made a mistake on that check. *Id.*

The Debtor used one account for funds from tenants on their triple net lease obligations. Several checks bounced. Tr., p. 232.

Sean Flisk was a 15% owner of the Debtor. He was paid member draws. Tr., p. 240. Over the relevant two-year period her family was paid $273,679.07. Tr., p. 241. Hot Pretzel, one of Dorothy's businesses, was paid $19,160 over the relevant two-year period, even though it had no business relationship with the Debtor. Tr., pp. 241-42. One check's memo line stated it was a loan but Dorothy does not recall what the loan was for or whether it was repaid. Tr., pp. 242-43. Check number 2720 was said in its memo line to be a loan to Hot Pretzel for $1,985. Their intention was to loan funds to Hot Pretzel. Tr., p. 243. That check bounced. Tr., p. 244.

The Debtor paid O'Hare BP Corp., a liquor store, $27,745.26, even though it does no

business with the Debtor. Tr., p. 245. Dorothy owns O"Hare BP Corp. *Id.* O'Hare Shell

Partners, a gas station, does no business with the Debtor, either.  The debtor loaned O'Hare BP

Corp. $1,765. It would have been categorized as a withdrawal. Tr., p. 246.

The Debtor wrote a $1,170 check to Kapitus Funding in connection to a loan that was

O'Hare BP Corp.'s debt. Tr., p. 246.  There were other checks made out to Kapitus Funding to

cover O'Hare BP Corp.'s debt to Kapitus Funding. Tr., p. 247.  One check from Debtor was

intended to pay an employee, Ana Miranda, for working for O'Hare BP Corp.  Tr., p. 248.

Several checks were issued to O'Hare Shell Partners, Dorothy's gas station.  Some

covered that business' payroll. Tr., pp. 251-52.

Checks were issued to Park Center Plaza, a mall in North Dakota.  We noted earlier in

this opinion that it was once owned by Brian Flisk and his now-deceased twin brother.  It was in

Dorothy's name but they all owned it together. Tr., pp. 252-53.  That entity was paid $7,425

over the relevant two-year period even though it had no business relationship with the Debtor.

Tr., p. 254.

The Debtor paid Skyfall Equestrian $27,742.33 over the relevant two-year period.

Dorothy was Skyfall's 90% owner.  Tr., p. 255.  The Debtor had no business relationship with

that entity. Tr., p. 256.

Checks were made out to VND which is Park Plaza Center.[2]  VND LLC received

$85,755.13 from the Debtor.  *Id.*  Most of the checks made out to that entity were signed by

Brian Flisk. Tr., p. 257.  Some of those funds were for Brian Flisk helping Dorothy; it is not

clear whether that was in addition to his $75,000 salary or management fee. Tr., p. 258.

---

[2] Sometimes referred to as Park Center Plaza.

Several entities in which Dorothy Flisk held an ownership interest – Hot Pretzel, O'Hare BP Corp., O'Hare Shell Partners, Park Plaza Center, Skyfall Equestrian and VND received $208,794 during the relevant time period. Tr., pp. 267-68.

The Debtor made payments to third parties on her behalf, too. Those included Bend Creek Farm which is in the hay business; the Debtor does not use hay in its business, however, hay was provided to one of her entities. Bend received $47, 437. Tr., pp. 269-72. Dorothy testified again that this was taken as a draw. Tr,. P. 270. The problem is that the Debtor's operating agreement prohibited distributions to equity holders before the Debtor's bills were paid.

The Debtor made payments to Compeer Financial, a bank, in the amount of $90, 914. Those payments benefitted Skyfall, one of Dorothy's businesses. The Debtor had no business with Compeer Financial. Tr., p. 271.

The Debtor paid Debro Construction for work it did for Skyfall. Tr., pp. 271-74.

The Debtor paid Dr. William Kehoe $5,250 for Brian Flisk's medical care in lieu of health insurance. Recall that Brain Flisk is not the Debtor's employee. Tr., pp. 274-75.

The Debtor paid for landscaping services performed at Brian Flisk's home. Tr., p. 275

The Debtor paid $12,792 to Dorothy's Sbarro restaurant in Chicago that is no longer operating. Tr., pp. 278-79.

The Debtor paid Fabulous Builders $5000 for work done at Side Piece, Dorothy's bar in Nashville. Tr., pp. 279-80.

The Debtor paid Gervais Electrical at least $6.057 for work performed at Side Piece. Tr., pp. 280-81.

10

The Debtor paid a Fort Wayne, Indiana landlord $144,449 in connection with a Sbarro restaurant that had operated there. Tr., p. 282.

The Debtor paid Grant Staffing $4,125 to write grants for a community center Dorothy started in south Lawndale; it was documented as a donation. Grant Staffing provided no services to the Debtor. Tr., pp. 282-83.

The Debtor paid Huntington Learning Center $1,574 during the relevant time period; the memo line of the check stated "for Alicia Flisk." Alicia Flisk is Brian Flisk's 15-year old daughter. Brian Flisk signed those checks. Tr., pp. 283-84.

The Debtor paid Inglewood Lofts $2,063; it covered homeowner assessments for Dorothy's home. The Debtor had no relationship with that payee. Tr., pp. 284-85.

The Debtor paid FP Ferrier $6,200 for hooves for horses' feet. That organization had no business relationship with the Debtor. Tr., p. 296.

The Debtor issued checks to Jewell Mechanical for work at the Side Piece bar (p.285), to Jump Start Farm for horse related service (p. 287), to Legacy Farm Homeowners Association in connection to Dorothy's horse farm (p. 288), to contractor Mark Agnello in connection with her property in Nashville (p. 289) and to Salt & Cayenne (p. 291) an entity that consults on restaurant-related projects. None of these expenditures were made on the Debtor's behalf.

Over the two-year period in issue, the Debtor expended $1,114,748 for services unrelated to its operations. That amount reflects checks only; it does not include ACH payments. Tr., p. 298.

The Debtor obtained an appraisal in 2021 for use in a property tax appeal that valued its property to be worth $4.4 million. Tr., pp. 311-15. A 2024 appraisal valued the Debtor's

11

property to be worth $5.9 million. Tr., pp. 315-17. When asked if appraisers were hired for high or law appraisals, Dorothy testified that appraisals sought for tax reduction proceedings were "usually low so that we can lower the taxes . . ." Tr., p. 353.

From approximately April, 2024 to the date the Debtor filed for bankruptcy relief it held onto $1,105,000 it did not pay the mortgagee and $480,000 in pass through amounts for taxes from tenants. Tr., pp. 327-28.

Dorothy Flisk testified that funds belonging to other entities were deposited into the Debtor's account. Tr., p. 336. She admitted that she did not abide by the operating agreement. Tr., p. 337. The Debtor's funds were to be used for its business only. Tr., p. 338.

Dorothy testified when questioned by her attorney that when she sent the Debtor's funds to other corporations she was using her money, as the funds were a draw. Tr., p. 341.

She knew, however, that disbursements to partners were to follow payment of Debtor's expenses. Tr., p. 346. She testified that the Debtor is abiding by its responsibilities that filing for bankruptcy entails: filing monthly reports and following budgets approved by the court. Tr., pp. 347-49.[3]

### B. Brian Flisk's Testimony

When asked how he went from not having an equity interest in the Debtor to being paid a buyout for an equity interest, Brian responded that he operated for his twin brother, a Catholic priest who could not operate a commercial interest. Tr., pp. 394-95. The brother had once been a mortgage banker. Tr., p. 696. Brian received approximately $5.6 million in the buyout. He

---

[3] At a February 24, 2026 hearing the lender's attorney raised concerns about whether improper spending continued, contrary to what was allowed by the cash collateral budget.

12

clarified that "we" received the funds and used a lot of it on the facility. Tr., p. 397. At one point he said an insurance company paid the buyout. Tr., p. 402. The buyout arrangement has not been reduced to writing. He may be owed funds for his buyout but has not filed a proof of claim in this bankruptcy case. Tr., pp. 403-04.

At one point Brian was identified as a manager of the Debtor. He testified that he is a manager of a manager. Tr., p. 405.

Brian testified that he never held an ownership interest in VND, the entity that owns a strip mall in Jamestown, North Dakota. Tr., p. 408.

When asked about an entry in lender's Exhibit 36 that says "VND Buyout 16th" Mr. Flisk said they used this as a vehicle for disbursing funds. He eventually explained that when he got buyout payments from the Debtor they did not go into his personal account or VND's account, they paid for various expenses. Tr., pp. 409-11.

A May 6, 2024 ACH transaction noted on Lender's Exhibit 36 has a memo that says "cap one." Cap One is one of his personal credit cards. There is another transaction involving "cap one" on November 8, 2024. Tr., pp. 436-37.

Brian Flisk testified that a May 8, 2024 check for $1,850 (# 2881) from the Debtor to him was a draw. However, he had no equity interest in the Debtor. He eventually testified that they received over a million dollars for the sale of the shopping plaza. Some of that was deposited into the Debtor. Tr., pp. 414-15.

The Debtor paid entity Selene $1,649 toward a mortgage on Brian's wife's residence. Selene has no relationship with the Debtor. He explained that it is his home but it is in his wife's name. Tr., pp. 415-16. Another payment to Selene is noted at Transcript page 421. He later

13

testified that the payments to Selene were for a condo his brother had at 501 West 24th Place in Chicago. Tr., pp. 428-29. Brian became the owner after his brother passed. Tr., p. 429.

The Debtor also paid $1,920 for his daughter's private school tuition at Benet Academy. Tr., pp. 416-17.

Mr. Flisk could not explain an October 30, 2024 $22,250 expenditure. Tr., pp. 423-24.

The Debtor made mortgage payments to a Mr. Cooper entity in connection to a home occupied by Brian's wife. Tr., pp. 429-30.

The Debtor also paid $5,463 to Citi for Brian Flisk's credit card. Tr., p. 445.

The Debtor paid $5,000 on Brian Flisk's American Express credit card.

Oddly, Brian Flisk explained that the Debtor could have a mortgage expense and in one instance treat it as a management fee for the Debtor's taxes and also treat it as a buyout to him. Tr., p. 451.

Brian Flisk has owned no businesses over the years. Tr., p. 452. However, he admitted that he has or had an ownership interest in National Distribution that has a rental at the Debtor's property. Tr., pp. 453-54.

The Debtor made payments to an entity known as North Dakota Investment Corp. Those funds may have gone to him. He inherited it from his brother. Tr., pp. 455-56.

The Debtor paid Pacific Life Insurance for a policy on Dorothy. Tr., p. 457.

The Debtor may have paid Attorney Robert Habib $650 for work on an O'Hare entity that has nothing to do with the Debtor. Tr., pp. 459-61.

The Debtor paid Wintrust for Dorothy's mortgage(s) for the condo or for the farm. Tr., pp. 461-62.

Two tenants' rent payments are being deposited into a pre-petition bank account, not the debtor-in-possession account. When asked to explain why, Brian Flisk testified that it would take a lot of trouble and time to change how those tenants send in their payments, even though the Debtor, at the time of his testimony, had been in bankruptcy for approximately 5 months. He admitted that it could have been done. Tr., pp. 463-65.

The Debtor made a $750 payment to cover security costs for Dorothy's O'Hare BP gas station. Tr., pp. 466-67.

The Statement of Financial Affairs at question number 5 asks whether the Debtor made payments or other transfers within 1 year of filing the case to any insider. Docket 1, p. 28. The Debtor answered zero. We know from the testimony of two of the Debtor's principals, Dorothy Flisk and Brian Flisk, that is not true. The Debtor filed a custom transaction detail report at Docket 105 that lists many of the transactions that involved the Debtor and its insiders. When asked about this discrepancy Brian Flisk testified that it was incorrect, if that was the question. Tr., pp. 474-77.

Oddly, Brian Flisk testified that Dorothy Flisk and Sean Flisk each held 15% of the Debtor. Tr., pp. 523-25. When Louden passed, his property went to Brian Flisk via communications with the family, not via a will. Tr., p. 526. He once said he bought the property, but said he was not speaking correctly when that was said. He is talking about his brother being on title; he was never on title. Tr., pp. 547-48. The priest's surviving adopted children had no say in the matter. Tr., pp. 527-28. The priest passed after the covid pandemic. Brian Flisk was a stand-in for his brother, a Catholic priest, who took a vow of poverty. Tr., p. 681.

Brian testified that to his recollection he was never a member or manager of the Debtor. Tr., pp. 528-29. He has no judgment liens and holds no assets. Tr., p. 549.

Brian testified that the Debtor received funds from O'Hare BP and O'Hare Shell as well as from other ventures owned by Dorothy. Tr., pp. 529-30. He does not know whether those were loans or gifts. Tr., p. 553. He said he is not an employee of the Debtor, but says he is a manager. He gets paid by taking a draw or by the Debtor paying his bills. Tr., p. 534. In contrast, however, he testified at an earlier deposition that he did not get a salary since he departed. Tr., pp. 541-42. Then he said he did not get draws, only bills paid. Tr., p. 542. When asked about getting compensation, he said his tuition and insurance bills got paid and eventually said he was getting money if you call that compensation. Tr., p. 543. He uses the Debtor to pay his bills because he does not have a salary. *Id.*

A filing submitted to the Illinois Secretary of State bears his name as a member/manager. He did not authorize that. Tr., pp. 550-51.

The initial buyout of his interest in the Debtor resulted in 15% going to Dorothy and 15% going to Sean Flisk. Tr., p. 544. A subsequent buyout was worth $8.5 million. *Id.* Tr., p. 558. One buyout was for $3.2 million; it came from fire insurance proceeds. Bills that the Debtor paid on his behalf were "part of the buyout." Tr., p. 545. He explained that he has received approximately $800,000 *Id.* He does not know how much he received before the loan was made or after the loan was made. Tr., p. 546. He said he has reported the sums received on his taxes. *Id.*

The debtor's operating reports include the extra account that was not closed when this case got filed. Tr., pp. 535-36.

16

There is a letter of intent for a bridge loan. Tr., p. 539.

The property's current occupancy rate is 85 to 87%. Tr., p. 658. Approximately 20% to 25% of the tenants are behind on paying rent. Tr., p. 663.

Art Burrows is helping to find tenants and buyers. Tr., p. 671. Brian Flisk opposes appointment of a receiver. Tr., p. 672. Brian said " I don't think the receiver has the same feeling for the property as the ownership. They look at it as a payment for their services, nothing more." *Id.* Considering the extent to which the Debtor's principals have used its resources to fund their expenses, without paying the mortgage, perhaps, Brian and Dorothy Flisk care about nothing but getting paid. He prefers that Dorothy continue to manage the property, however, should it get purchased, new owners might have other plans. Dorothy and Brian Flisk are not the only persons who can manage the property, even though they are using the property's resources to pay his child's expenses and to fund Dorothy's residences and business ventures. There is nothing so unique about the Debtor's property that stands in the way of another person managing it.

Brian's twin brother Louden Flisk orally gifted him a payment stream of his buyout. Tr., p. 676. No will was probated, he did not know if the laws of intestacy were followed. He did not know that the Statute of Frauds requires that property transfers be in writing. Tr., pp. 678-79.

Brian Flisk was asked about his failure to pay a Peoples Gas bill for gas received at a property where he was serving as its receiver. The Illinois Appellate Court case is *Peoples Gas Light & Coke Co..v. Flisk,* 97 Ill App.3d 1123 (1st Dist. 1981). According to the Appellate Court, gas service was provided to a building at 5334 W. Madison St., Chicago where Brian Flisk served as a receiver; he obtained a surety bond from United States Fidelity & Guaranty

17

Company, Mr. Flisk's co-defendant in a suit filed against him for nonpayment of a $18,152.97 gas bill. The gas company prevailed. He was not found to be personally liable; he was liable in his role as receiver. The reviewing court said the trial "court did not errr when it granted summary judgment against Flisk, as receiver, and denied his motion to vacate that order." 97 Ill.App.3d, 1126. Brian Flisk did not recall that case. Tr., p. 695.

Dorothy Flisk once used space in the Debtor's building for a flower shop but did not pay rent for use of it. Tr., p. 107.

In the future tenants will be required to personally guarantee leases. Tr., p. 718.

### C. Testimony of Jonathon Margolis of the Farbman Group

Mr. Margolis has served as a receiver in 9 matters over his career. He has served in a support role in 25 receivership matters. He has been appointed by the Circuit Court of Cook County, Illinois to serve as a receiver in the Debtor's mortgage foreclosure case. Tr., p. 483.

He explained that receivers follow the instructions in the orders issued by the judges who appoint them.

### D. Testimony of Eric Enloe

Mr. Enloe is a certified general real estate appraiser who holds several professional certifications. He appraised the property for Mr. Descalzo's employer, LNR. Tr., p. 613. He valued the property to be worth $19,400,000 as of September 1, 2023. Tr., p. 622.

On cross examination, in commenting on the Debtor's 87.2% occupancy rate, Mr. Enloe said that the property was not performing as well as the market and is not stabilized. Tr., p. 644. When the property was evaluated in 2024, the appraiser did not have the 2024 rent roll information. Tr., pp. 647-49. The amount of rent collected affects value. Tr., pp. 649-50.

18

### E. Mr. Joseph Hibbs' Testimony

He is a tenant; he is satisfied with the property's management and is not aware of any safety or health issues there.  Tr., pp. 730-733.  He acknowledged paying a proportionate share of the property's taxes and insurance obligations.  Tr., p. 747.  He also acknowledged that there is nothing in his lease(s) that conditions his lease(s) on any particular person(s) being the property manager.  Tr., p. 754.  He did not know that the property was not insured for a period of time.  Tr., p. 769.

### F. Tenant Bruce Phillip Haas' Testimony

He has not experienced any significant maintenance issues.  Tr., p. 789.

### G. Mr. Arthur Burrows' Testimony

Mr. Burrows is a licensed real estate broker.  Tr., pp. 819-20.  According to him the property is in better condition than most; it has been well maintained.  Tr., pp. 821- 823.  He has worked with this property for 10 years.  Tr., p. 828.

He testified that being in bankruptcy puts downward pressure on value.  Tr., p. 834.  Occupancy has gone down since August, 2025; it is at 85% occupancy.  Tr., pp. 847-49.  A drop of 10% in occupancy affects the bottom line; however, that is seen as a temporary thing.  Tr., p. 850.

Burrows may have testified previously at a deposition that the property was worth between $15 million and $16 million.  There were discussions of $14 million and $17,775, 000.  Tr., pp. 852-57.  He has not received any written offers, just discussions.  Tr., p. 858.

Mr. Burrows discussed a discrepancy between how much the tenants paid for taxes and

tenants.  Tr., pp. 860-863; pp. 866-69.

Mr. Burrows discussed the problem that the use of funds for expenses unrelated to the property caused the problem with Wells Farrgo's loan.  Tr., p. 878.  One potential lender said he was not interested because of the cash flow issues.  Tr., pp. 880-81; p. 886.  Mr. Burrows informed that to do these kinds of loans it has to be squeaky clean.  A lock box option was discussed because of discomfort with how the borrower, the Debtor, handled cash.  Tr., pp. 882-84.  The court finds that understandable.  A succeeding lender has to wonder whether its loan will get paid.

Mr. Burrows has been trying to sell this property for several years.  Tr., p. 899.

### H. Mr. William J. Enright's Testimony

Mr. Enright is a real estate appraiser who evaluated the property on the income capitalization approach which involves analyzing the income-generating potential of the property.  He also used the sales comparison approach. Tr., p. 913.  He concluded that the property is worth $17.2 million.  Tr., p. 915.  He said that contract rental rates are slightly below market rates.  Tr., p. 919.  The Debtor's monthly income at the time he testified was $197,217.36.  However, it includes hypothetical income for vacant units.  Tr., p. 933.  A unit was owner-occupied.  Tr., pp. 936-37.

Buyers and brokers price buildings based on net rentable area.  Tr., pp. 943-44; pp. 947-48.  His sales comparables may have been evaluated based on gross area.  Tr., p. 951-534.  An alternative value of $12,870,000 was discussed in terms of measuring rentable space as opposed to measuring gross space.  Tr., pp. 953-54.  The common areas and mechanicals are not rentable spaces.  Tr., p. 955.

### III. Analysis

### A. Bankruptcy Code Section 543

When a debtor files for bankruptcy relief, a bankruptcy estate is created.  The estate includes all of the debtor's "legal and equitable interests in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  Section 543(a) of the Bankruptcy Code prohibits disbursements by a custodian of a debtor's property once they have knowledge of the bankruptcy case.  That section states that a custodian with knowledge of the commencement of the bankruptcy case shall not make any disbursements from or take actions in the administration of the debtor's property in its possession.  In addition, the custodian shall deliver to the trustee, the debtor, any property of the debtor held by the custodian as well as the proceeds, rents or profits of such property and file an accounting of the property of the debtor that came into the custodian's possession at any time.  11 U.S.C. § 543(b)(1) and (2).

Section 543(d) states that after notice and a hearing the bankruptcy court may excuse compliance with the obligations in subsections (a) and (b), described above, if the interests of creditors would be better served by permitting the custodian to continue in possession, custody or control of such property.  "This section reinforces the general abstention policy found in § 305 of the Bankruptcy Code by permitting the bankruptcy court to authorize the custodianship to proceed pursuant to the order of the state court notwithstanding the mandate in § 543(b) that the debtor's property is to be turned over. " (citations omitted).  *In re Falconridge, LLC*, 2007 WL 3332769, *6 (Bankr. N.D. Ill. November 8, 2007).

In *Falconridge* this court discussed the factors to be evaluated in resolving motions to excuse compliance with the turnover requirement of Section 543 of the Code.

These factors have evolved to include, in varying degrees:

(1) The likelihood of a reorganization;

(2) The probability that funds required for reorganization will be available;

(3)Whether there are instances of mismanagement by the debtor;

(4) Whether the turnover would be injurious to creditors;

(5) Whether the debtor will use the turned over property for the benefit of its creditors;

(6) Whether or not there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate; and

(7) the fact that the bankruptcy automatic stay has deactivated the state court receivership action.

*Falconridge*, at *7.

In *In re Novus Structure, Inc.* Judge Cleary aptly noted that while these factors were helpful, omission of consideration of the debtor's interest in § 543 analysis does not preclude its consideration. I agree with his assessment that 'the debtor's ability to control property of the estate and its proceeds to restructure and propose a plan, as a fiduciary of the estate – which works a benefit to the debtor as well as to creditors – may be considered. " *In re Novus Structures*, 653 B.R. 429, 438 (Bankr. N.D. Ill. 2021).

### B. Analysis of Factors

#### 1. Likelihood of Reorganization

The Debtor is not likely to be able to reorganize as it can't raise funds to at least satisfy its

priority administrative expenses. It has stated that it is trying to refinance Wells Fargo's debt and that it has a term sheet with an entity that can do so. However, no such refinance effort has been disclosed to date. The Debtor's broker, Mr. Arthur Burrows, testified that a potential purchaser made a $14 million offer to purchase the Debtor but that the Flisks did not accept it. They are holding out because they estimate its value to be as high as $19 million.

The Debtor's appraiser Mr. Enright testified that the Debtor's real estate is worth $17 million. When questioned about whether the appraised value should include unrentable space he conceded that it could be worth only $12 million.

Not only does the Debtor have a value problem, it has a trust problem. At least one prospective lender hesitated to purchase the Debtor's assets or refinance its debt because it could not be sure that the Debtor's principals, the Flisks, were truthfully reporting its financial condition. No responsible lender conducting necessary due diligence analysis will trust and rely on information from its records that show that over $1.1 million was spent on the principals' personal expenses, including their residences, businesses and a child's education. If they refused to pay Wells Fargo's mortgage debt, what stops them from refusing to pay a future mortgagee's debt? The Debtor's principals can't be trusted. Note that a potential investor realized that acquiring an ownership stake was too risky.

We know from analysis of the Debtor's physical checks that at least $1.1 million was spent improperly. That does not account for ACH withdrawals. Why did the Debtor bounce so many checks? Its records showed it has profits according to Mr. Descalzo, but it bounced checks. Oddly, Debtor's counsel said during final argument that the bounced checks were eventually paid. Tr., p. 1013. No such evidence was presented at the trial of this matter; the

23

principals may have said they were eventually paid, but it would take more than that to prove that they were paid, knowing how extensively they used the Debtor's assets for their personal expenses, including business expenses for Dorothy Flisk's bar in Nashville which were paid for while the bankruptcy case was pending. That business opened in October, 2025. This factor weighs against turnover to the Debtor.

### 2. The Probability that Funds for Reorganization Will be Available

As explained in the preceding section, funds are not likely to be available. No one appears to be interested in acquiring an interest in the Debtor or loaning it funds.

### 3. Whether There Are Instances of Mismanagement by the Debtor

Mismanagement abounds. The Debtor generated sufficient rental income to pay its debts. It chose not to do so, preferring to cover the principals' personal and business expenses.

The Debtor's principals have yet to consolidate its bank accounts and use only the debtor in possession account. Mr. Flisk testified that it would be an administrative hassle to have two corporate tenants switch payments to that account so those two tenants are still using the old account. At a February 24, 2026 hearing herein on the use of cash collateral, the court was told that they may be using funds in that account beyond what is allowed in the cash collateral order. That issue will be explored at a hearing on Monday, March 2, 2026 at 2:00 p.m.

This factor weighs against turnover to the Debtor.

### 4. Whether Turnover Would be Injurious to Creditors

Turnover would be injurious to creditors who have had to stand by and observe the Debtor's principals finance several personal and business expenses totally unrelated to the Debtor's operations. The transcripts document those expenditures. The Debtor's principals have

Debtor's operations. The transcripts document those expenditures. The Debtor's principals have used it as a personal piggy bank. They may have thought that because there could be equity above what they owe Wells Fargo that it would be easy to refinance the debt. The market is not cooperating. No lender has stepped forward to take a chance on refinancing the debt and wind up being the next mortgagee to not receive payments. No investor has offered to provide funds by obtaining equity. Tr., pp. 882-83. No potential buyer has surfaced, deterred undoubtedly by reluctance to rely on the Debtor's financial records. A huge problem is Dorothy Flisk's testimony that the Debtor owed Brian Flisk $8.5 million as a buyout of his ownership interests. This obligation has not been reduced to writing. Brian testified that he never owned anything, but insisted on being paid for an ownership interest. Also concerning is the fact that Brian testified that he uses his deceased brother as a stand-in. Ownership of various assets were in the brother's name with the understanding that Brian was the real owner. Is Brian trying to avoid having his creditors access his property to satisfy his debts? What potential purchaser or lender wants to inherit this kind of ownership issue? None. Are the Debtor's principals reporting their receipt of funds as income to the Internal Revenue Service?

Brian has been allowed to write checks to cover his expenses. The red flags abound; why take a chance on borrowers who so flagrantly disregard their payment obligations?

This factor weighs against turnover to the Debtor.

**5. Whether the Debtor Will Use the Turned Over Property for the Benefit of Its Creditors**

The Debtor's principals are incapable of using the Debtor's real estate for the benefit of its creditors. They testified that the funds used for their personal expenses and business ventures were draws. However, their operating agreement requires that equity not receive funds until

drawn up at the mortgagee's insistence. They have not followed it and are not likely to do so in the future. The Debtor's use of the real estate will not benefit its creditors.

This factor weighs against turnover to the Debtor. Its principals are not likely to respect its creditors' rights to payment. The Debtor did not experience financial problems or circumstances beyond its control as did the debtor in *In re Novus* where Judge Cleary noted that[4] the debtor's financial problems were caused by the condition of its property and the loss of a tenant. It has been stressed many times that our Debtor's property is in good condition and that its tenant base in improving. The problem is that its principals simply refuse to pay the mortgage, tax and insurance debts even though it has resources to do so.

### 6. Whether or not There Are Avoidance Actions Issues Raised with Respect to Property Retained by a Receiver, Because A Receiver Does Not Possess Avoiding Powers for the Benefit of the Estate

The receiver order allows the receiver to manage the real estate by collecting the rents, to assist the mortgagor and mortgagee with marketing the property for lease and to repair the property. Motion to Clarify Receiver's Duties, Receiver Order, Docket 116, Exhibit A.

There are avoidance issues. While under Illinois law receivers generally do not have power to pursue avoidance actions, the appointment of a receiver should halt the complained of transactions before a trustee or other estate representative can step in to pursue them. *See* 735 ILCS 5/15-1704(b). where receivers' duties are delineated ; they include efforts to secure tenants and execute leases; collect rents, issues and profits; insure the mortgaged property; employ counsel and pay taxes. "A receiver appointed pursuant to this Article must manage the

---

[4] Broker Arthur Burrows testified at a status hearing on February 5, 2026 that some vacancies had been filled recently. Transcript, February 5, 2026, Docket 241, p. 3.

mortgaged real estate as would a prudent person, taking into account the effect of the receiver's management on the interest of the mortgagee." 735 ILCS 5/15-1704(c).

This factor may not weigh in favor of excusing turnover to the Debtor. However, turning the property over to the Debtor's principals certainly would not lead them to sue themselves for the many improper expenditures they have made with the Debtor's funds. However, to the extent that this factor does not weigh in favor of turnover, it is outweighed by the several factors that favor excusing turnover.

### 7. The Fact that the Bankruptcy Automatic Stay has Deactivated the Receivership Action

The filing of this bankruptcy case did halt the receivership lawsuit. However, as explained in section II, pp. 2-5, the automatic stay was held to not be in effect as to the trial that was in its final stage when this bankruptcy case was filed. The state court was allowed to conclude that lawsuit which resulted in the appointment of a receiver. This court said "[s]hould the parties need to address the effect of the ensuing state court orders on this bankruptcy case, they can do so in the future." Order, Docket 29. Before the court is a Motion to Clarify (Docket 116) which asks this court to allow the state court's order appointing the receiver to take effect while the motion to excuse turnover is under consideration.

### IV. Conclusion

Having considered the evidence in light of the factors courts regularly weigh in deciding whether turnover to a debtor from a custodian or receiver is in the best interests of creditors or the debtor, the court finds that the movant has met its burden by a preponderance of the evidence that the interests of creditors and the Debtor would be better served if the receiver appointed by

27

the state court is excused from complying with section 543(b) of the Bankruptcy Code.

The court did consider the interests of the Debtor. The Debtor's interests would be better served by excusing turnover as its principals are not acting in the Debtor's best interest by using its resources to fund their personal expenses and other businesses.

The receiver is excused from turning over the Debtor's real estate and personal property to the Debtor.

The state court's orders appointing the receiver are in full force and effect immediately. The receiver shall have full possession of the Debtor's property.

The court will enter a separate order, consistent with this ruling.

Date: March 3, 2026                         ENTERED:

                                            _____
                                            Jacqueline P. Cox
                                            Chief Bankruptcy Judge